UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

KEVIN JERMYN,

                         Plaintiff,

          v.

CAROLYN W. COLVIN, Acting Commissioner of
Social Security,

                        Defendant.

----------------------------------------------------------------

**MEMORANDUM & ORDER**
13-CV-5093 (MKB)

MARGO K. BRODIE, United States District Judge:

        Plaintiff Kevin Jermyn commenced the above-captioned action seeking review pursuant to 42 U.S.C. § 405(g) of a final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying his application for disability insurance benefits. Defendant moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the Commissioner's decision is supported by substantial evidence and should be affirmed. (Docket Entry No. 14.) Plaintiff cross-moves for judgment on the pleadings, arguing that Administrative Law Judge Hilton R. Miller ("ALJ") committed reversible error by (1) failing to consider the opinion of the state agency psychological consultant; (2) finding that Plaintiff's bipolar disorder is not a severe impediment; (3) finding that Plaintiff retained the functional capacity to perform medium work; and (4) improperly evaluating Plaintiff's credibility. (Docket Entry No. 16.) For the reasons set forth below, Defendant's motion for judgment on the pleadings is denied. Plaintiff's cross-motion for judgment on the pleadings is granted.

## I. Background

Plaintiff filed an application for disability insurance benefits on June 25, 2010, claiming that he became eligible for such benefits on June 26, 2008.[1]  (R. 114, 126.)  Plaintiff indicated on an undated Disability Report that he has the following medical conditions:  back/knee/foot pain, bipolar disorder, anxiety, depression, panic attacks, high cholesterol, and high blood pressure.  (R. 130.)  Plaintiff's application for disability benefits was denied on October 22, 2010.[2]  (R. 68–79.)  Plaintiff timely requested a hearing before an ALJ, which was held on September 21, 2011.  (R. 33, 80–81.)  Plaintiff and Melissa Fass Karlin, a vocational expert, testified at the hearing.  (R. 33.)  By decision dated October 13, 2011, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. 20–32.)  Plaintiff sought review of the ALJ's decision by the Appeals Council.  (R. 17–19.)  The Appeals Council denied Plaintiff's request for review on July 15, 2013, making the ALJ's decision the final decision of the Commissioner.  (R. 1–6.)

### a.  Plaintiff's testimony

Plaintiff is a 61-year old former stationary engineer.  (R. 36–37.)  Plaintiff can no longer work due to problems with his back, knees and hips, (R. 41), which causes him pain on a daily basis, (R. 57).  Plaintiff testified about his bipolar disorder condition.  Five years prior to the hearing, he was hospitalized for a "nervous breakdown."  (R. 47.)  He was hospitalized at South

---

[1]  Although in Plaintiff's application for disability benefits he indicated that he became eligible for disability benefits on October 28, 2008, (R. 114), this date was later corrected in an Field Office Disability Report dated June 25, 2010, (R. 126 (stating that "original onset was input as [O]ctober which was incorrect").)

[2]  The Notice of Disapproved Claim sent to Plaintiff denying his application for disability benefits is undated, (R. 68–79), however, the ALJ indicated in his decision that the application was denied on October 22, 2010, (R. 23).

Beach Psychiatric Center "in a lockup" for thirty days,[3] and has received psychiatric treatment since then by "Dr. Home" and "Dr. Fish."[4] (R. 48–49.) Since his hospitalization, Plaintiff regularly takes his medication for his bipolar condition every day. (R. 50.) His symptoms are "up and down," and, in spite of taking his medication regularly, he has had "bad incidents," including a fight with his stepson which resulted in the police responding to his home. (R. 51.) Plaintiff has had intermittent treatment throughout his life for bipolar disorder.[5] (R. 57.) His pain exacerbates his mental condition and he is not comfortable around other people. (R. 58.) Plaintiff's counsel represented to the ALJ that Plaintiff fights with his wife often. (R. 60.)

Plaintiff denied drinking alcohol but indicated that he occasionally uses marijuana. (R. 52.) When asked about particular medical records describing his "long-standing" problems with drugs and alcohol, Plaintiff reiterated that he occasionally uses marijuana, does not take any other drugs, except for those prescribed to him, and has not had alcohol in "many, many, many" years.[6] (R. 52.) Plaintiff currently spends his time walking his dogs and playing his guitar. (R.

---

[3] Plaintiff testified about the circumstances which led to his hospitalization. (R. 55–56.) According to Plaintiff, he got into an altercation with a driver while parking in front of his house, after he "touched bumpers" with the driver's car. (R. 55.) Plaintiff told the driver that if there was any problem, he could call the police, at which point the driver became "indignant." (Id.) After a neighbor got involved, Plaintiff's wife called the police. (Id.) Plaintiff's wife told the police that Plaintiff was "high on [marijuana], and that [he was] out of [his] mind." (R. 55–56.) Plaintiff started "acting a little more crazy with the cops in the emergency room [by] telling them to go get some donuts and leave [him] alone" and he was placed in the psychiatric ward. (R. 56.)

[4] Plaintiff appears to have been referring to Dr. Kyi Kyi Ohn and Dr. Clifford Fisch. (See infra Parts I.d.ii.2, 3.)

[5] During the hearing, the ALJ and Plaintiff referred to bipolar disorder and "manic" disorder interchangeably. (See R. 50, 56–57.)

[6] Plaintiff's attorney indicated at the hearing that there was "some disagreement" as to whether Plaintiff has a problem with substance abuse, explaining that, as indicated in Plaintiff's

43.)  Plaintiff testified that he "occasionally" will see his brother, he does not see his friends often, and does not go out at night.  (R. 49.)  Plaintiff indicated that he has trouble traveling alone, explaining that he felt "seasick" while traveling to the hearing.  (R. 58.)

### b.  Plaintiff's work history

Plaintiff has a refrigeration and a high-pressure boiler license, and completed four years in an apprentice program.  (R. 38–39.)  Plaintiff was last employed as a stationary engineer at the Health and Hospital Corporation, in or about 2007.  (R. 37.)  He worked for this company for thirty-eight years.  (*Id*.)  His responsibilities included working in the boiler room where he operated and maintained the boilers, working with the air-conditioning equipment in the building, "making rounds of the machinery spaces," repairing machines and evaluating repairs. (*Id*.)  On his Disability Report, Plaintiff indicated that as a stationary engineer, he would typically walk for four hours a day, stand for three hours a day, sit for two hours a day, stoop for one hour a day, kneel for one hour a day, handle large objects for three hours a day, write, type or handle small objects for one hour a day, and reach for an object six hours a day.  (R. 132.) Plaintiff typically did not have to climb, crouch, or crawl at this job, though he did have to lift and carry equipment of up to 100 pounds or more.  (*Id*.)  He frequently lifted objects of about ten pounds.  (*Id*.)  When asked at the hearing whether his previous employment as a stationary engineer required him to carry heavy equipment, Plaintiff stated that he once had to carry a piece of pipe, which he characterized as "like a cannon," with other employees, though he said that this type of work was "atypical" of his duties.  (R. 40.)

Plaintiff further testified that he was on his feet "a lot of times" and also spent "a lot" of

_____

medical records, Plaintiff "den[ied] substance abuse throughout the course of his hospitalization."  (R. 53.)

time sitting answering telephone calls, though he explained that towards the end of his

employment, he worked the night shift and thus, spent most of the time sitting. (*Id.*) When

Plaintiff first started working, he was paid $3.50 an hour. (R. 41.) In 2006, he earned $90.402;

in 2007, he earned $90,705; and in 2008, he earned $101,806. (R. 41–42.)

### c. Vocational expert's testimony

Fass Karlin, a vocational expert, classified Plaintiff's previous job as a stationary

engineer as having a "DOT code" of 950.382-027[7] and a specific vocational preparation ("SVP")

of 7.[8] (R. 62.) The ALJ presented the following hypothetical to Fass Karlin:

> [C]onsider a hypothetical individual of the claimant's age,
> education and work experience, and the residual functional
> capacity to lift and/or carry up to 50 pounds occasionally, 25
> pounds frequently, stand and/or walk with normal breaks for a total
> of about six hours in an eight-hour workday, sit with normal breaks
> for a total of about six hours in an eight-hour workday.

(R. 63.) Fass Karlin stated that this hypothetical worker could perform Plaintiff's past relevant

work. (*Id.*)

---

[7] "DOT" refers to the Dictionary of Occupational Titles, a publication by the United States Department of Labor. *Blault v. Soc. Sec. Admin., Comm'r.*, 683 F.3d 443, 446 (2d Cir. 2012). "The DOT gives a job type a specific code . . . and establishes, among other things, the minimum skill level and physical exertion capacity to perform that job." *Id.* This DOT code is "useful for determining the type of work a disability application can perform," and "a vocational expert whose evidence conflicts with the DOT must provide a 'reasonable' explanation to the ALJ for the conflict." *Id.* (citing Social Security Ruling (SSR) 00–4p, 2000 WL 1898704 (Dec. 4, 2000).

[8] "SVP stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job." *Urena-Perez v. Astrue*, No. 06-CV-2589, 2009 WL 1726217, at *20 n.43 (S.D.N.Y. Jan. 6, 2009) (quoting Jeffrey Scott Wolfe & Lisa B. Proszek, *Social Security Disability and the Legal Profession* 163 (2002)), *report and recommendation adopted as modified*, No. 06-CV-2589, 2009 WL 1726212 (S.D.N.Y. June 18, 2009). An SVP of 7 describes a job that requires training of "[o]ver 2 years up to and including 4 years." *See* Dep't of Labor, Dictionary of Occupational Titles Appendix C, 1991 WL 688702; also available at http://www.occupationalinfo.org/appendxc_1.html#II.

### d. Medical evidence

#### i. Evidence relating to Plaintiff's alleged physical impairments

##### 1. Staten Island Physician Practice

Plaintiff sought treatment from the Staten Island Physician Practice, starting on June 4, 2001, before his alleged onset date, and continuing until May 26, 2010. (R. 210–226.) The earliest records from this facility indicate that he was referred by Sureshchandra Patel, M.D., a physician affiliated with Staten Island Physician Practice, to Richard C. Strauss, M.D. regarding his lower back pain. (R. 224.) Plaintiff visited Dr. Strauss on June 4, 2001, and reported lower back pain "radiating into the right lower extremity for more than five years." (R. 224.) Plaintiff further reported that he had been treated with a "variety of conservative treatments, including physical therapy, chiropractic [treatment], medications and at least three epidural steroid injections," but still continued to experience pain. (*Id.*) During Dr. Strauss' examination, Plaintiff rose easily from a seated position and was able to ascend to the examining table without assistance. (*Id.*) Dr. Strauss reported that his examination of Plaintiff's lower back did not reveal "any true point tenderness or palpable deformities," and that Plaintiff's "strength, tone, and bulk of the muscle groups of both lower extremities" were normal. (*Id.*) Dr. Strauss did note that there was "slightly altered sensation along the lateral aspect and sole of the right foot." (*Id.*)

On August 24, 2001, Plaintiff visited Arkadiy Baumval, PA and Edwin M. Chang, M.D., for a consultation, upon referral from Dr. Patel. (R. 223–24.) During the visit, Plaintiff was diagnosed with "degenerative disc disease of L4-5 and L5-S1, with bilateral foraminal narrowing at L5-S1." (*Id.*) It was further noted on this date that Plaintiff suffers from "a loss of disc height at L5-S1 to a greater degree than L4-5." (*Id.*) Plaintiff was offered fusion surgery to assist with

the pain, but Plaintiff was "apprehensive" about the prospect of surgery, and stated that he would like to start with acupuncture for pain relief. (R. 223–24.)

Plaintiff continued to complain of pain in his lower back, right knee and thigh during his regular visits with John Reilly, M.D. at Staten Island Physician Practice between October 31, 2002, and February 14, 2007. (R. 218–23.) On April 19, 2006, Dr. Reilly noted that an MRI showed "some fraying of the lateral meniscus and a little degenerative change in the ACL and PCL." (R. 219.) On July 21, 2004, Dr. Reilly noted that Plaintiff appeared "more anxious and depressed" and indicated that Plaintiff was seeking follow-up care from an internist for possible medication for these symptoms. (R. 220.)

On February 8, 2010, Plaintiff visited Staten Island Physician Practice, to check on his blood pressure, obtain a prescription refill, and to discuss his medication. (R. 211–12.) Plaintiff saw Diana Kaplinsky, D.O., who indicated that Plaintiff suffered from hypertension, bipolar disorder, and mixed hyperlipidemia. (R. 212.) Dr. Kaplinsky characterized each of these ailments as "chronic." (*Id.*) For these conditions, Dr. Kaplinsky recommended that Plaintiff continue the same regimen, low-sodium, low-fat/cholesterol diet, and indicated that Plaintiff was "asymptomatic of suicidal/homicidal ideation/thoughts." (*Id.*) Dr. Kaplinsky also noted the following as "pertinent negatives:" "blood in urine, buzzing/noise in ears, chest pain, confusion, sweating, headache, irregular heart beat/palpitations, nausea and vomiting, nose bleeds, [shortness of breath], tiredness, visual disturbances, [and] transient weakness, claudication or tremor." (R. 211.) As of September 20, 2011, Plaintiff's last treatment with Dr. Kaplinsky was on June 1, 2011. (R. 457.)

### 2. Staten Island University Hospital

On October 8, 2008, Plaintiff sought treatment at the emergency room of Staten Island

University Hospital following a car collision in which he was involved as a driver. (R. 356.) He complained of pain in his neck or back. (*Id.*) An X-ray performed of his cervical spine showed "mild narrowing of the C5–C6 and C6– C7 intervertebral disc spaces with mild proliferative change."[9] (R. 369.) A report prepared of his examination concluded that there were "diffuse degenerative changes of the cervical spine most prominent at C5–C7" and "[s]traightening of the normal lordotic curvature of the cervical spine, [which is] consistent with muscle spasm or positioning." (R. 370.) A reviewing physician concluded that there was "scoliosis and degenerative change in the visualized thoraco-lumbar spine." (R. 373.) A CT scan was also performed of Plaintiff's head, which showed "no evidence of intracranial hemorrhage, mass, mass effect, or midline shift" and "mild thickening of ethmoid sinuses." (R. 372.)

### 3. Dr. Sujit Chakrabarti

Dr. Chakrabarti provided a consultative examination report based on a September 8, 2010 assessment of Plaintiff's back and knee pain. (R. 437–42.) Dr. Chakrabarti noted that Plaintiff's lower back pain started after he was involved in an automobile accident approximately thirty years earlier. (R. 437.) Plaintiff reported that his lower back pain "radiates down to his right leg," causing him to walk with a limp, and that, occasionally his knee buckles. (R. 438.) Plaintiff also complained of atrophy in his leg muscles and that cold and damp weather "aggravate[]" his condition. (*Id.*) Plaintiff rated his pain on a scale of zero to ten, as ranging between a four and a seven, with four being the least painful and seven being the most painful. (*Id.*) Plaintiff also complained of numbness in his left hand due to carpal tunnel syndrome and problems with his eyesight. (*Id.*) Plaintiff claimed during his examination that he can stand for

---

[9] The report from the X-ray noted that the exam was "slightly degraded by patient motion." (R. 369.)

ten to fifteen minutes, but then he has to change positions or "take a rest." (*Id.*) Plaintiff further stated that he can sit for ten to fifteen minutes, after which he experiences spasms, and that he can walk for approximately four to five blocks. (*Id.*) Plaintiff indicated that he has to get help from friends and family to complete chores. (*Id.*)

Dr. Chakrabarti observed that Plaintiff "walks with a limp and bending forward" but that Plaintiff could get on the examining table without problem. (R. 439.) Dr. Chakrabarti reported Plaintiff's range of motion in his shoulder as "120 degrees over 130 degrees on both sides," Plaintiff's "[a]bduction [as] 120/150 on both sides," and his abduction, internal rotation, external rotation, elbow, wrist, knee, hip and ankle as all within normal range. (*Id.*) Dr. Chakrabarti further noted that Plaintiff's cervical spine lateral rotation is "40 degrees over 45 degrees on both sides," his flexion is "45 degrees over 45 degrees," his extension is "40 degrees over 45 degrees," his rotation of the cervical spine is "40 degrees over 45 degrees on both sides," his flexion/extension of the lumbar spine is "90 degrees over 90 degrees," his lateral flexion is "30 degrees over 30 degrees" and his straight leg raising test is "80 degrees on both sides." (*Id.*) Dr. Chakrabarti noted a "slight restriction of forward elevation of the shoulder" and "some atrophy of the right calf." (R. 439–440.) He diagnosed Plaintiff with possible arthritic changes in both of his knees, radiculopathy in the lumbar area, and possible carpal tunnel syndrome. (R. 440.) He characterized Plaintff's prognosis as "guarded," and indicated that "[t]he cause of [Plaintiff's] atrophy of the right calf should be evaluated further to find out if there is any definite reason why [his] calf is atrophied [and] [t]he deep pain in the knee also should be evaluated if possible through the [X]-ray or MRI." (*Id.*)

### 4. Regional Radiology Outerbridge

On September 15, 2010, an MRI of Plaintiff's right knee and lumbar spine was

performed at Regional Radiology Outerbridge, and interpreted by Dr. Michael T. Mantello. (R. 436.) The MRI showed no abnormality in Plaintiff's right knee. (*Id.*) In particular, the "[f]rontal and lateral views of the right knee demonstrate[d] the bony structures and articular surfaces to be unremarkable," and the MRI showed "no fracture, joint effusion, or joint space narrowing." (*Id.*) The MRI also did not show any "focal abnormal bone density" in Plaintiff's right knee. (*Id.*)

Regarding Plaintiff's lumbar spine, the MRI displayed "mild curvature of the thoracolumbar junction," "convex to the right " and " moderate degenerative disc changes as described." (*Id.*)

### 5. J. Niles[10]

J. Niles completed a Physical Residual Functional Capacity Assessment of Plaintiff, dated September 29, 2010.[11] (R. 430–35.) Niles concluded that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (R. 432–33.) However, Niles determined that Plaintiff had certain exertional limitations, namely that Plaintiff could not occasionally lift and/or carry more than fifty pounds, could not frequently lift and/or carry more than twenty-five pounds, could not stand and/or walk with normal breaks more than six hours in an eight hour day, or sit (with normal breaks) more than six hours in an eight hour day. (R. 431.) Niles determined that Plaintiff had no push and/or pull limitations other than as provided for in the lift and/or carry limitations. (*Id.*) In reaching this conclusion, Niles noted that (1) Plaintiff's x-ray of the right knee showed no evidence of abnormality; (2) the x-ray of Plaintiff's lumbar

---

[10] J. Niles' first name is not in the record.

[11] The record does not identify Niles as a doctor. (*See* R. 435 (failing to identify the signatory of the Physical Functional Capacity Assessment, J. Niles, as either a medical consultant or a single decision maker).)

spine showed "mild curvature of the thoracolumbar junction, convex to the right and moderate degenerative disc changes in the L1–L2, L4–L5 and L5–S1 levels;" (3) while the consultative examiner observed that Plaintiff walked with a limp and bending forward, there did not appear to be any medical reason for such as the findings from the physical examination were "nearly normal;" and (4) Plaintiff's range of motion in his shoulders, cervical and lumbar spine, as well as his wrists, knees, hips were all observed to be normal. (*Id*.) Niles also noted that although Plaintiff complained of numbness in his left hand, no motor or sensory loss was observed in his upper or lower extremities, and while mild atrophy in his calf was found at the consultative examination, the etiology of this condition was not clear. (R. 431–32.)

Niles concluded that the medical evidence indicated that Plaintiff has a medically determinable impairment that causes his alleged symptoms and limitations. (R. 434.) However, Niles noted that according to Plaintiff, this impairment has existed for thirty years, a time period during which Plaintiff continuously worked, and further observed that Plaintiff is able to drive. (*Id*.) Thus, Niles determined that "[m]edical findings do not support [the] severe limitations" alleged by Plaintiff. (*Id*.) In response to questions on the Physical Residual Functional Capacity Assessment report form as to whether there was a treating or examining source statement regarding Plaintiff's physical capacities or whether Niles' conclusions about Plaintiff's limitations or restrictions "significantly" differed from those reached by any treating/examining medical sources, Niles did not provide a response, however, he did note that the consultative examiner, Dr. Chakrabarti, did not provide any specific functional limitations. (*Id*.)

### ii.    Evidence relating to Plaintiff's alleged mental impairment

#### 1.    Staten Island University Hospital

On May 5, 2007, Plaintiff was transported to Staten Island Hospital after his wife called the police regarding a confrontation between Plaintiff and a neighbor. (R. 325–33.) Plaintiff's wife reported that Plaintiff had been smoking marijuana with his medication and was behaving erratically and abusively to neighbors. (R. 327.) Plaintiff's "presenting problem" was listed as "bipolar" on the FDNY Prehospital Care Report, (R. 329), and his chief complaint was listed as "irrational behavior" on the Emergency Nursing Record, (R. 334). Plaintiff was restrained with handcuffs. (R. 334–35.)

Plaintiff's past medical history was reported to include anxiety and "chronic back pain." (R. 334.) Plaintiff was uncooperative for a physical exam and his mental status was characterized as hostile and non-communicative. (R. 337.) Plaintiff was diagnosed with polysubstance abuse and "bipolar disorder, not otherwise specified." (R. 342.) During his hospitalization, Plaintiff "exhibited grandiosity consistent with mania." (*Id*.) It was unclear whether Plaintiff's symptoms were due to substance abuse or to a psychiatric disorder. (*Id*.) Plaintiff complained to the consultant performing a psychiatric evaluation on the date of his admission that "they think I'm crazy because I'm buying a guitar from Bob Dylan." (R. 344.) He also complained of back pain. (*Id*.) Plaintiff's attitude, affect, mood, form and content of thought process, insight, and judgment were characterized as abnormal, and he exhibited suicidal and homicidal ideation. (R. 345.) Plaintiff was discharged on May 23, 2007. (R. 331.) Upon discharge, Plaintiff was deemed "free of psychosis" and there was "no evidence of mania [or] suicidal or homicidal ideation." (R. 342.)

Plaintiff received additional treatment from Staten Island University Hospital's Partial Hospital Program. (R. 382–89.) He was admitted to this program on June 7, 2007, for assessment as a result of the altercation and hospitalization in May 2007. (R. 382.) Plaintiff

complained that he was suffering from anxiety and depression.  (*Id.*)  Plaintiff further reported

that, as of this date, he was on "sick leave" for his mental illness disability.  (R. 383.)  Plaintiff

indicated, as part of his medical history, that he has chronic, shooting pain in his lower back.  (R.

385.)  Plaintiff's mood was characterized as anxious, and his affect was listed as "constricted."

(R. 387.)  Plaintiff was diagnosed with a bipolar condition, chronic back pain, and "relationship

issues."  (R. 388.)

According to a discharge summary prepared by the Partial Hospital Program, Plaintiff

only completed the first day of the program and then refused to return.  (R. 389.)  A "mobile

cruiser" located Plaintiff, but Plaintiff did not wish to return to the program.  (*Id.*)  Plaintiff was

"not considered a danger to [him]self or others," and the program deemed him "self-discharged"

from the program.  (*Id.*)  His diagnosis is listed on the discharge summary report as

"bipolar . . . manic, [and] severe psychosis."  (*Id.*)  It is noted on this record that an individual

affiliated with the "mobile cruiser" planned to continue to try to stay involved with Plaintiff.

(*Id.*)

### 2.  Dr. Sabrahman Ramanthan

Among the medical evidence submitted from Dr. Clifford B. Fisch, (*see infra* Part

I.d.ii.3), is a one-page handwritten letter dated June 16, 2007.  (R. 380.)  The signature on the

letter is unintelligible, but it is stamped with the name, "Dr. Sabrahman Ramanthan," and

addressed to "whom it may concern."  (*Id.*)  The letter states, "I have examined the above patient

and he is disabled until he gets further consultation."  (*Id.*)  This one-page letter is the only

document in the record that appears to be associated with Dr. Ramanathan.[12]

---

[12]  It is not clear why this document is included amongst the treatment records from Dr.
Fisch.

### 3. Dr. Clifford B. Fisch

Plaintiff saw Dr. Fisch, a psychologist, for therapy treatment from June 15, 2007,
following Plaintiff's hospitalization and treatment at Staten Island University Hospital, through
2010.  (R. 270–322.).  During these sessions, Plaintiff discussed his depressive feelings and
outbursts.[13]  During certain sessions, occurring before the Plaintiff's alleged onset date, Dr.
Fisch observed that Plaintiff demonstrated some illogical thinking.  (R. 274, 282.)  Dr. Fisch also
once noted in July 2007, that he needed to further assess Plaintiff's "reality testing" and the
possibility of "psychotic process."  (R. 308.)

Dr. Fisch's treatment notes suggest that at times, Plaintiff felt that his psychiatric
symptoms were improving, and other times, they were persistent.  (*Id.*)  In July 2007, Plaintiff
reported that he had been feeling "good" for some time, but that things were "going downhill,"
as a result of illness in his family and a friend who failed to return his calls.  (R. 301.)  In a letter
dated July 23, 2007, addressed to Plaintiff's former employer, Dr. Fisch reported that Plaintiff
appeared to have a "significant affective disorder," with a "working diagnosis of bipolar
disorder," not otherwise specified.  (R. 377.)  Dr. Fisch stated in his letter that "[a]lthough
[Plaintiff] achieved some degree of stabilization shortly after initiating therapy," Plaintiff had
recently reported a "relapse" in mood stabilization and control and that his medications were no
longer as effective.  (*Id.*)  In view of this change, Dr. Fisch indicated that Plaintiff was not yet
ready to return to work.[14]  (R. 377.)  Dr. Fisch further indicated that it remained "to be

---

[13]  During a visit on February 12, 2008 with Dr. Fisch, Plaintiff discussed his back pain,
indicating that he had not been doing anything to relieve that pain.  (R. 280.)

[14]  It is not clear based on the record whether Plaintiff's absence from work in July 2007
stemmed from the June 16, 2007 letter from Dr. Ramanthan describing Plaintiff as "disabled,"

determined whether [Plaintiff] will be sufficiently alert to operate equipment safely once an effective therapeutic dose has been achieved." (*Id.*)

In August 2007, Plaintiff reported experiencing a panic attack when he realized he missed an appointment. (R. 294.) Dr. Fisch sent a follow-up letter to Plaintiff's employer, dated August 20, 2007. (R. 378.) In this letter, Dr. Fisch stated that Plaintiff "has improved significantly with regard to stabilization of mood and affect," due to, in part, "collateral psycho-pharmacologic treatment." (*Id.*) Even with the improvement, Dr. Fisch wrote, Plaintiff still reported "episodes in which he has difficulty modulating emotional reactions to frustrating circumstances," which result in "poor judgment with respect to his personal safety as well as the potential effects of his behavior on others." (*Id.*) Dr. Fisch concluded that at that time, Plaintiff was still not ready to return to work. (*Id.*)

During a session in September 2007, Plaintiff stated that he was doing better. (R. 291.) In a letter dated September 12, 2007, addressed to Plaintiff's employer, Dr. Fisch stated that Plaintiff has "achieved significant psychological equilibrium," and was ready to return to work. (R. 379.) Dr. Fisch explained that while in the past, stress from the activities of daily living often resulted in "explosive behavior" from Plaintiff, at this time, Plaintiff had been successful at "negotiat[ing] such situations without untoward incidents occurring." (*Id.*)

In October 2007, Plaintiff indicated to Dr. Fisch that the medication was helping him to control his temper and mood swings. (R. 289.) Plaintiff further reported that he was feeling "stable," though he complained that he lacks "enthusiasm [and] seems unable to experience real joy." (R. 290.) In December 2007, Plaintiff expressed that he had difficulty interacting with

---

(R. 380), or from Plaintiff's "sick leave," for mental illness disability from June 7, 2007, (R. 383).

other people.  (R. 285.)

On January 8, 2008, Plaintiff reported to Dr. Fisch that he almost hit his wife with a vacuum cleaner during an argument.  (R. 282.)  On February 12, 2008, Plaintiff reported to Dr. Fisch that he had not been "mentally at ease for some time," though Plaintiff concluded that his depressive feelings were part of the aging process.  (R. 280.)  In response to Plaintiff's indication that his medication was not providing "full symptom relief," Dr. Fisch recommended to Plaintiff that he review his medication with his psychiatrist.  (*Id*.)  Regarding this session, Dr. Fisch noted that Plaintiff "appeared to be in relative control" and that "[h]e did not display the anger and rage that he has shown in the past."  (R. 281.)  During a February 26, 2008 session, Plaintiff indicated that he was continuing to have difficulty controlling his temper, and that he did not "feel right." (R. 278.)  Among other things, Dr. Fisch suggested that Plaintiff report his feelings to his psychiatrist to see if a change in his "regimen" was needed.  (R. 279.)  On March 20, 2008, Dr. Fisch held a joint session with Plaintiff and his wife.  (R. 276–77.)  During this session, Plaintiff's wife indicated that she was "encouraged by [Plaintiff's] early response to treatment," though she described a recent "set back" that she believed was triggered by Plaintiff's father's illness and work she had done around their house.  (R. 276.)

During one session in May 2008, Dr. Fisch noted that Plaintiff indicated that he was nervous at the prospect of having to drive, and that he resents his wife for the control that she has over his life due to his inability to "do things for himself."  (R. 274.)  Plaintiff also indicated during this session that he felt that it was "manipulative and vindictive" of his wife to have him arrested and brought to South Beach Psychiatric Center, seemingly referring to his May 2007 hospitalization.  (*Id.*)

On June 10, 2008, Dr. Fisch noted that Plaintiff was in a "jolly mood," "full of sarcastic

humor," and that he "den[ied] any problems at home." (R. 272.) Plaintiff indicated that he did

not know why his wife made an appointment for him with Dr. Fisch and that he only came to the

appointment to "comply with her issues." (*Id*.) Among other things, Dr. Fisch discussed

Plaintiff's "self-described explosiveness" and the need to control his emotions. (*Id*.) Dr. Fisch

recommended to Plaintiff that he increase his therapy sessions to one session every two weeks.[15]

(*Id*.)

### 4. Dr. Kyi Kyi Ohn

Between June 19, 2007 and December 14, 2007, Plaintiff regularly visited Dr. Kyi Kyi

Ohn, a psychiatrist who treated Plaintiff for his bipolar condition.[16] (R. 169–90, 228–70.) Dr.

Ohn first treated Plaintiff on June 19, 2007, following his discharge from South Beach

Psychiatric Center. (R. 190.) During her initial assessment, Dr. Ohn noted that Plaintiff has an

"anger problem." (*Id*.) According to the Initial Psychiatric Assessment form dated June 19,

2007, Plaintiff reported occasional marijuana use, past medical history for a kidney stone, and

that he was anxious and irritable, but he indicated no suicidal or homicidal intent. (R. 192–93.)

Dr. Ohn diagnosed Plaintiff with bipolar disorder, and quantified Plaintiff's Global Assessment

of Functioning ("GAF")[17] level as 55, indicating "variable functioning/moderate symptoms." (R.

194.) During her subsequent visits with Plaintiff, with one exception on August 25, 2010, Dr.

---

[15] Plaintiff indicated on the Social Security Administration's "Claimant's Recent Medical Treatment" form that he had received continued treatment from Dr. Fisch since November 18, 2010, though he did not provide any specific dates for any subsequent treatment. (R. 457.)

[16] The record also indicates that Dr. Ohn treated Plaintiff for "cannabis abuse." (R. 169−185.)

[17] The GAF scale "ranks psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." *Pollard v. Halter*, 377 F.3d 183, 185 n.1 (2d Cir. 2004).

Ohn quantified Plaintiff's GAF level as 65, (R. 169–71, 174–75, 178–80, 184−86, 450−55), indicating that Plaintiff has "difficulty functioning in single area/mild symptoms," (R. 194). Plaintiff saw Dr. Ohn monthly between July 2007 and December 2007. (R. 184–87, 244–48.) During each of these visits, Dr. Ohn described Plaintiff's mood as euthymic. (*Id*.) On July 10, 2007, Plaintiff reported feeling better. (R. 187, 247.) On September 7, 2007, Dr. Ohn noted that Plaintiff's mood was better and that Plaintiff was "in control." (R. 249.) On December 14, 2007, Plaintiff indicated that he would "wake at night." (R. 184, 244.)

In 2008, Plaintiff saw Dr. Ohn monthly through July, (R. 177–183, 242–238.), and again in October, November and December, (R. 174–76, 234–36). During his 2008 visits with Dr. Ohn, Plaintiff reported various family issues, including instances of marital discord. (R. 180, 182.) Dr. Ohn characterized Plaintiff's mood and affect during his April, May, June, and December 2008 visits as "euthymic." (R. 178–80, 238–40.) During his July 30, 2008 and October 2, 2008 visits, Plaintiff reported that he was doing well. (R. 176–77, 236–37.) On November 12, 2008, Dr. Ohn described Plaintiff's mood and affect as anxious. (R. 174, 234.) In December 2008, Dr. Ohn characterized Plaintiff's mood and affect as euthymic. (R. 175, 235.)

The record reflects that Plaintiff saw Dr. Ohn three times in 2009. (R. 171–73.) During his March 25, 2009 visit, Plaintiff stated that he was doing well, (R. 173, 233), but on June 24, 2009, Dr. Ohn reported, among other things, that Plaintiff was angry, upset, "not pleased," "not comfortable [at] home," and had no motivation, (R. 172, 232). At his October 21, 2009 visit, Plaintiff complained of back pain to Dr. Ohn but reported that he was doing well. (R. 171, 231.)

Plaintiff continued treatment with Dr. Ohn in 2010. (R. 169–170, 228.) On January 19, 2010, Dr. Ohn described Plaintiff as nervous, paranoid, moody and "labile," although she also described his mood and affect as euthymic. (R. 170, 230.) On April 23, 2010, he reported that

he was not experiencing any side effects from his medication. (R. 169, 229.) He admitted to using marijuana to help with his back pain, and stated that he does not use Vicodin. (*Id.*) At this April 2010 visit, and also during Plaintiff's July 6, 2010 visit, Dr. Ohn reported Plaintiff's mood as euthymic and anxious. (R. 169, 228–29.)

The record indicates that Plaintiff saw Dr. Ohn several more times in 2010 and 2011. (R. 450–55.) Dr. Ohn consistently reported Plaintiff's mood as euthymic during these visits. (*Id.*) On a progress note dated August 25, 2010, Dr. Ohn quantified Plaintiff's GAF level at 55; during her November 1, 2010, December 20, 2010, April 18, 2011, August 31, 2011, and June 16, 2011 assessments, Dr. Ohn listed Plaintiff's GAF level at 65. (*Id.*)

### 5. Dr. Sudharam Idupuganti

Dr. Idupuganti, a consultative examiner, examined Plaintiff on August 13, 2010. (R. 405.) Dr. Idupuganti described Plaintiff as being "in touch with reality, pleasant and cooperative," and noted that Plaintiff "answered questions openly and willingly." (R. 407.) Dr. Idupuganti further observed that Plaintiff's speech "was coherent and relevant" and "of normal productivity with normal rate and speed of talk." (*Id.*) He described Plaintiff's thought processes as "logical and goal directed" and indicated that Plaintiff did not exhibit any "thought process disorder, delusions, auditory or visual hallucinations." (*Id.*) Dr. Idupuganti further noted that Plaintiff denied any "suicidal or homicidal ideations." (*Id.*)

Regarding Plaintiff's mood and affect, Dr. Idupuganti indicated that Plaintiff's mood "has been chronically depressed." (*Id.*) Dr. Idupuganti referenced Plaintiff's hospitalization at South Beach Psychiatric Center, and noted that Plaintiff's hospitalization followed his mother's death, and was Plaintiff's "only major depressive episode." (*Id.*) Since then, Dr. Idupuganti indicated that Plaintiff has been in outpatient treatment and that his symptoms were under control

with medication. (*Id.*) Dr. Idupuganti also assessed Plaintiff's "[s]ensorium and intellectual functioning," and stated that Plaintiff had normal memory functions, normal auditory digit span, average intellectual skills, and normal social judgment skills. (*Id.*)

Dr. Idupuganti completed a functional assessment of Plaintiff. (R. 407–08.) Dr. Idupuganti stated that Plaintiff walks his two dogs, helps his wife with chores such as cooking, cleaning and shopping, and is "able to take care of his activities of daily living." (R. 408.) Dr. Idupuganti further observed that Plaintiff can take public transportation and that he has "a few friends that live on Staten Island and in New Jersey." (*Id.*) Dr. Idupuganti diagnosed Plaintiff with "dysthymic disorder," and indicated that Plaintiff's "major depression, single episode" was in remission. (*Id.*) He further characterized Plaintiff's depression as "of moderate intensity," but observed that Plaintiff could "interact appropriately with others in a social and occupational setting." (*Id.*) Dr. Idupuganti recommended that Plaintiff continue treatment with this psychiatrist and continue his antidepressant medication. (*Id.*) He characterized Plaintiff's prognosis as "[g]ood with continued treatment." (*Id.*)

### 6. Dr. P. Kudler[18]

Dr. Kudler, a State agency psychiatric consultant, completed a "Psychiatric Review Technique" form ("Psychiatric Review"), and a "Mental Residual Functional Capacity Assessment," form ("Mental RFC") for Plaintiff, based on the claims file.[19] (R. 410–27.) In the Psychiatric Review, Dr. Kudler indicated that Plaintiff exhibited "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome," and "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and

---

[18] Dr. Kudler's first name is not in the record.
[19] There is no indication that Dr. Kudler examined Plaintiff. His report indicates that he had access to "reports from the tmds [sic] and a recent independent psych evaluation." (R. 426.)

depressive syndromes (and currently characterized by either or both syndromes)." (R. 413.) Dr. Kudler characterized Plaintiff's limitations as "mild" for restriction of activities of daily living, "difficulties in maintaining social functioning," and "difficulties in maintaining, concentrating, persistence or pace," and found that Plaintiff suffered from "one or two" "repeated episodes of deterioration" of extended duration. (R. 420.)

In the Mental RFC, Dr. Kudler concluded that Plaintiff was not significantly limited in areas of understanding and memory, sustained concentration and persistence, social interaction, or adaptation. (R. 424–25.) Dr. Kudler further noted the following, regarding Plaintiff's mental condition:

> [Plaintiff] carries a diagnosis of Bipolar Disorder . . . . [Plaintiff] can follow and understand directions. He can perform simple tasks independently. He can maintain attention and concentration. He can maintain regular schedule. He can learn new tasks. He can make appropriate decisions. He relates adequately. [Plaintiff] is able to dress, bathe and groom himself. He cooks, cleans, shops and manages his money. [He] takes public transport independently. He exhibits adequate social, cognitive and coping skills.

(R. 426.)

### e. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act. First, the ALJ found that Plaintiff had not engaged in substantial activity since June 26, 2008, the alleged onset date. (R. 25.) Second, the ALJ found that Plaintiff's lumbar radiculopathy constituted a severe impairment, because it has resulted in "limitations that significantly affect [Plaintiff's] ability to perform basic work activities such as lifting and carrying." (*Id*.) The ALJ noted that Plaintiff was also diagnosed with knee and foot problems, which included "possible arthritic changes," has

complained of "hand pain," and has bipolar disorder, but found that these conditions did not constitute severe impairments.  (*Id*.)

Regarding Plaintiff's knee and foot problems, the ALJ found that there was no evidence in the record to show that they "cause[d] more than minimal limitation" in his ability to perform "basic work activities."  (*Id*.)  In support of this finding, the ALJ refers to an MRI performed on September 15, 2010, which showed no evidence of abnormality, and Dr. Chakrabarti's examination of Plaintiff's knee on September 8, 2010, which showed normal knee function.  (*Id*.) The ALJ found that Plaintiff's hand pain also did not implicate a severe impairment, explaining that there had been no "definitive diagnosis" of any hand impairment, as the record only refers to a "possibility" of carpal tunnel syndrome.  (*Id*. (referring to Dr. Chakrabarti's examination on September 8, 2010).)

The ALJ concluded that Plaintiff's bipolar disorder is also not severe as it did not cause more than a minimal limitation on Plaintiff's ability to perform basic mental work activities. (R. 26.)  The ALJ considered the "four broad functional areas," which are set forth in the disability regulations and in section 12.00C of the Listing of Impairments, for evaluating mental disorders:  (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.  (*Id*.)  The ALJ found that Plaintiff has only mild limitation in the first three broad functional areas.  (*Id*.)  As to the first broad functional area, activities of daily living, the ALJ noted that Plaintiff walks his dogs, helps with chores, and takes public transportation.  (*Id*.)  Regarding Plaintiff's social functioning, the ALJ cited the fact that the notes from Plaintiff's psychiatric treatment with Dr. Fisch described him as in a "jolly" mood, with sarcastic humor and as denying any problems at home.  (*Id*.)  Regarding the third broad functional area, concentration, persistence or pace, the ALJ referred to Dr. Ohn's treatment

notes which indicated that Plaintiff had no difficulty with thought control or process, and Dr. Idupuganti's examination which described Plaintiff as having "coherent and relevant speech, logical and goal directed though processes, average intellectual skills, good memory skills, and good insight and judgment." (*Id.*)

With respect to the final broad functional area, episodes of decompensation, the ALJ explained that there was "no evidence" that Plaintiff experienced episodes of decompensation of extended duration. (*Id.*) According to the ALJ, Plaintiff has only had one hospitalization for mental illness, several years ago. (*Id.*) The ALJ acknowledged Plaintiff's psychiatric treatment from May to June 2007, and the fact that Dr. Ramanathan considered Plaintiff "disabled" in June 2007. (*Id.*) However, the ALJ also pointed to Plaintiff's psychotherapy treatment on September 11, 2007, in which he reported "achieving psychological equilibrium, with a marked reduction of stress" and Plaintiff was cleared to return to work. (*Id.*) The ALJ also noted that while Plaintiff continues to receive treatment from his psychiatrist, he has stopped seeing his psychologist for several years, and that during his consultative examination on August 13, 2010, Plaintiff had "a good general appearance, coherent and relevant speech, logical and goal directed thought processes, average intelligent skills, good memory skills, and good insight and judgment." (R. 26–27.) Because Plaintiff's mental impairment had resulted in no more than "mild limitations" in the first three functional areas, and as there were no episodes of decompensation of extended length, the ALJ determined Plaintiff's bipolar condition was not severe. (R. 27.)

At the third step in the sequential evaluation, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or equals the severity of one of the listed impairments in Appendix 1 of the regulations. (*Id.*) The ALJ considered Listing 1.04 for disorder of the spine, and found Plaintiff's back disorder did not meet the criteria because

there was "no evidence of compromise of a nerve root or the spinal cord." (*Id*.) Fourth, the ALJ concluded that Plaintiff "has the residual functional capacity to perform the full range of medium work." (*Id*.) In making this finding, the ALJ acknowledged that Plaintiff's impairment could cause the alleged symptoms, but determined that his statements about the "intensity, persistence and limiting effects of these symptoms" were not credible to the extent that they were not consistent with the residual functional capacity ("RFC") assessment. (*Id*.) The ALJ acknowledged the following medical evidence in his finding: the September 15, 2010 MRI showing "mild curvature of the thoracolumbar junction, and moderate degenerative disc changes;" testing of the cervical spine performed on October 8, 2008 showing degenerative changes at the C5-C6 and C6-C7 levels; Dr. Chakrabarti's September 8, 2010 examination finding that Plaintiff's cervical and lumbar spine lateral rotation, flexion, and extension were all within normal limits; the fact that Plaintiff's treatment records for back pain ended before the alleged onset date; and Plaintiff's last treatment records for back pain indicated that Plaintiff was tolerating his medication well, his pain was controlled and his gait was normal. (R. 28.) The ALJ also noted that Plaintiff testified that his pain medication was effective and that he often walks his dogs and drives. (*Id*.)

Finally, the ALJ determined that Plaintiff could perform his past relevant work as a stationary engineer, as that work did not require the performance of any activities that were precluded by the RFC he determined. (*Id*.) The ALJ relied upon Plaintiff's testimony that for the last ten years that he worked, his job duties consisted of answering phone calls, did not require much walking around, and carrying "heavy items" was "atypical" for his work. (*Id.*) The ALJ further noted that the vocational expert testified that Plaintiff would be able to perform his past relevant work, identified as DOT code 950.382-026, which is performed at the medium

exertional level. (*Id.*)  The ALJ concluded that Plaintiff was not disabled.

## II.  Discussion

### a.  Standard of Review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  Substantial evidence requires "more than a mere scintilla." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).  Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).  The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 2d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723

(2d Cir. 1983)).

### b. Availability of benefits

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Social Security Act (the "Act"). To be eligible for disability benefits under the Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

### c.   Analysis

Defendant moves for judgment on the pleadings, claiming that the Commissioner's decision is supported by substantial evidence and should be affirmed.  (Def. Mem. 2.)  Plaintiff also moves for judgment on the pleadings, contending that Defendant's decision should be vacated because (1) the ALJ failed to address the opinion of Dr. Kudler, the State agency psychological consultant, (2) the ALJ's finding that Plaintiff's bipolar disorder was not a severe impairment and did not last the requisite twelve months was not supported by substantial evidence, (3) the record does not support the ALJ's finding that Plaintiff retained the functional capacity to perform "medium" work; and (4) the ALJ did not properly evaluate Plaintiff's credibility.  (Pl. Mem. of Law in Support of Mot. for J. on the Pleadings ("Pl. Mem."), Docket Entry No. 16.)  As set forth below, the Court finds that the ALJ did not err in failing to explicitly address the opinion of the state agency psychological consultant, or in determining that Plaintiff's bipolar disorder was not a severe impairment.  However, the Court finds that the ALJ's RFC determination is not supported by substantial evidence, requiring remand of this case.  Because the ALJ's credibility analysis was based on his RFC determination, the Court directs the ALJ to reassess Plaintiff's credibility on remand.

### i.   ALJ's failure to explicitly reference Dr. Kudler's opinion is not grounds for remand

Plaintiff contends that the ALJ was mandated by Social Security regulations to consider the findings of Dr. Kudler, the state agency psychological consultant, as to the nature and severity of Plaintiff's mental impairment as "expert opinion evidence of [a] nonexamining source[]" and accordingly, the ALJ was required to consider Dr. Kudler's opinion, and explain

what weight he gave Dr. Kudler's opinion in reaching his conclusion. (Pl. Mem. 11–12.) Instead, according to Plaintiff, the ALJ failed to even mention the existence and opinion of Dr. Kudler, constituting reversible error. (Pl. Mem. 10−13.) Plaintiff further claims that the ALJ's finding that Plaintiff could perform his past relevant work was belied by Dr. Kudler's opinion that Plaintiff was "limited to 'perform[ing] simple tasks independently,'" and the ALJ consequently erred "in not providing reasons for his obvious rejection of Dr. Kudler's opinion." (*Id*. at 10−11.)

The ALJ is required to evaluate and weigh the medical findings of non-treating physicians. *See* 20 C.F.R. § 416.927(c) ("[W]e will evaluate every medical opinion we receive . . . ."); 20 C.F.R. § 416.927(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . . , as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us."). However, the Second Circuit has explained that "'[w]hen . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" *Lowry v. Astrue*, 474 F. App'x 801, 805 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)); *see Christina v. Colvin*, No. 14-CV-1168, --- F. App'x ----, ----, 2015 WL 690113, at *1–2 (2d Cir. 2015) (rejecting the plaintiff's argument that the ALJ committed reversible error by dismissing a portion of an opinion by a consultative examiner and failing to discuss portions of the state-agency psychologist's opinion in light of the fact that the ALJ's determination was consistent with both consultative examiner's

report and the state agency psychologist's opinion).

Here, the ALJ determined that Plaintiff's bipolar disorder did not constitute a medically determinable impairment that is severe.  (R. 25–26.)  The ALJ concluded that Plaintiff's bipolar disorder did not meet this threshold in light of evidence demonstrating that Plaintiff's mental impairment did not cause more than a "minimal limitation" to Plaintiff's ability to perform basic work activities, including the following evidence, which the ALJ specifically cited to and referenced, demonstrating that (1) as of September 11, 2007, Plaintiff had reached a "psychological equilibrium;" (2) Plaintiff had no difficulty with thought control or process, according to his treating physician; (3) Plaintiff demonstrated "coherent and relevant speech, logical and goal directed thought processes, [and] average intellectual skills," during his August 13, 2010 consultative examination; (4) Plaintiff exhibited a "jolly mood" and had been feeling well as reported to his treating therapist; and (5) Plaintiff testified that he can take care of activities of daily living, such as chores, shopping and can take public transportation.  (R. 26–27 (citing treatment records from Dr. Ohn, Dr. Ramanathan, Dr. Fisch, and Dr. Idupuganti).)  The ALJ's detailed explanation of, and citation to, the evidentiary record as it relates to his determination as to the severity of Plaintiff's mental impairment permits the Court to glean the rationale of his determination.  Under these circumstances, the ALJ was not required to specifically cite Dr. Kudler's findings.[20]  *See Lowry*, 474 F. App'x at 805 (finding that the ALJ

---

[20]  In addition, there is no reason to believe that the ALJ, who explicitly indicated that his decision was based on "careful consideration of all of the evidence," (R. 23), and who referred to Dr. Kudler's report in his list of exhibits, (R. 31), did not consider Dr. Kudler's reports.  *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.");  *Webb ex rel K.S. v. Colvin*, No. 13-CV-737, 2014 WL 2927774, at *3 (N.D.N.Y. June 27, 2014) (noting that "the ALJ's decision indicates that his findings were made '[a]fter careful consideration of the entire record,' and the "mere fact that the ALJ did not specifically mention [the opinion of a non-

did not err by failing to "meaningfully explain" reasons for not crediting certain evidence where the rationale for his decision was evident from review of the record, and where there was substantial evidence supporting the ALJ's decision); *LaRock ex rel. M.K.v. Astrue*, No. 10-CV-1019, 2011 WL 1882292, at *6 (N.D.N.Y. Apr. 29, 2011) (noting that "there is no obligation for the ALJ to discuss every piece of evidence contained in the record," and finding that as the ALJ "engaged in a thorough review of [the plaintiff's] medical and educational history," he did not err by failing to specifically refer to, *inter alia*, various emergency room visits, plaintiff's separate diagnosis of a separate anxiety disorder, and a specific opinion from the plaintiff's therapist), *report and recommendation adopted*, 2011 WL 1883045 (N.D.N.Y. May 17, 2011).

Moreover, contrary to Plaintiff's argument, Dr. Kudler's findings support the ALJ's disability determination. Dr. Kudler did not conclude, as Plaintiff contends, that Plaintiff was "*limited* to performing simple tasks independently." (Pl. Mem. 10 (emphasis added).) Rather, Dr. Kudler noted, as part of his narrative RFC assessment, that Plaintiff "*can* perform simple tasks independently," and provided no indication that Plaintiff was limited in any respect. (R. 426 (emphasis added).) Dr. Kudler's observation that Plaintiff "can perform simple tasks independently" as well as his other conclusions that Plaintiff is "not significantly limited" in the areas upon review (understanding and memory, sustained concentration and persistence, social interaction, and adaptation), is consistent with the ALJ's conclusion that Plaintiff's bipolar disorder "does not cause more than minimal limitation in the claimant's ability to perform basic

---

examining psychological consultant] does not mean that the opinion was not considered or afforded the proper weight").

mental work activities."[21] (R. 25, 424–25.) Thus, to the extent that Plaintiff asserts that the

ALJ's conclusion is contradicted by Dr. Kudler's findings, the Court rejects this

mischaracterization of the record. Even assuming, as Plaintiff claims, that the ALJ overlooked

Dr. Kudler's report in error, given that Dr. Kudler's findings actually *support* the ALJ's

conclusion, any omission by the ALJ with respect to Dr. Kudler's conclusions would not

constitute reversible error. *See Davis v. Colvin*, No. 12-CV-641, 2013 WL 4812024, at *3

(N.D.N.Y. Sept. 10, 2013) ("Where discussion of an omitted medical report 'would not have

changed the outcome of the ALJ's decision,' such omission constitutes 'harmless error.'"

(quoting *Walzer v. Chater*, No. 93-CV-6420, 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26,

1995))). In sum, the Court finds that the ALJ did not commit reversible error by failing to

explicitly reference Dr. Kudler's findings.

### ii. The ALJ's finding that Plaintiff's bipolar disorder was not a severe impairment is supported by substantial evidence

Plaintiff next argues that the ALJ erred in step two of his analysis when he determined

that Plaintiff's bipolar disorder did not constitute a severe impairment. (Pl. Mem. 13–18.)

According to Plaintiff, the ALJ incorrectly found that "there is no evidence that [Plaintiff's

bipolar condition] caused significant limitations for a [twelve] month period." (*Id*. at 13.)

Plaintiff contends, contrary to the ALJ's observations, that the record confirms that Plaintiff's

bipolar disorder is "longstanding" and severe. (*Id*.) In particular, Plaintiff points to his May

---

[21] The Court notes that the record suggests that Dr. Kudler's findings were based on medical reports from Plaintiff's claims file, including the assessment notes from Dr. Idupuganti, whose records the ALJ *does* explicitly refer to in his decision. (*See* R. 426 (records from Dr. Kudler indicating that he had access to records "from the tmds [sic] and a recent independent psych evaluation.").)

2007 hospitalization for "altered mental status," his post-hospitalization treatment with Dr. Fisch and Dr. Ohn, treatment records from 2008 through 2010 variably describing Plaintiff as demonstrating "illogical thinking," and as suffering from panic attacks, anxiety, and depression, the fact that the consultative psychiatrist, Dr. Idupuganti, described Plaintiff's depression as "of moderate intensity," and that contrary to the ALJ's finding, the record "documents several episodes of decompensation." (*Id*. at 13–18.)

At step two of the sequential evaluation, the ALJ is required to determine the medical severity of a claimant's impairment. 20 C.F.R. § 404.1520(c). In addition to the five-step sequential analysis, the Social Security regulations require application of a "special technique" when evaluating the severity of a medically determinable mental impairment. 20 C.F.R. § 404.1520a(a); *see Kohler*, 546 F.3d at 265 (2d Cir. 2008) ("Th[e] regulations require application of a "special technique" at the second and third steps of the five-step framework."); *Petrie v. Astrue*, 412 F. App'x 401, 408 (2d Cir. 2001) (same). This technique requires that once an ALJ determines that a claimant has a medically determinable mental impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). If the degree of limitation in the first three functional areas is mild or better, and no episodes of decompensation are identified, then the ALJ will conclude that the impairment is not severe "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d). In the Second Circuit, courts consider an ALJ's assessment at "step two" as limited only to "screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995); *Wilson v. Colvin*, No. 13-

CV-6286, 2015 WL 1003933, at *19 (W.D.N.Y. Mar. 6, 2015) ("The Second Circuit has held that the step-two severity test 'may do no more than screen out *de minimis* claims.'" (citing *Dixon*, 54 F.3d at 1030)). Thus, a "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality . . . [with] no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 09-CV-5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling 85–28, 1985 WL 56856, at *3 (Jan. 1, 1985)). The Court cannot disturb the ALJ's factual finding in this regard, unless it determines that this finding is not supported by substantial evidence. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *see Hecht v. Barnhart*, 217 F. Supp. 2d 356, 362 (E.D.N.Y. 2002) ("[T]his Court may remand, modify, or reverse the [Social Security Administration's] final decision only if [it] has misapplied the appropriate legal standard, or if the finding is not supported by substantial evidence." (citing *Balasmo v. Chater*, 142 F.3d 75, 79 (2d Cir 1998))).

Here, after application of the special technique, the ALJ determined that, while Plaintiff's bipolar condition constituted a medically determinable mental impairment, it was not severe. First, the ALJ considered the first broad functional area of "activities of daily living." In assessing Plaintiff's limitations in this area, the ALJ noted that Plaintiff "walks his dogs, helps with chores such as cooking, cleaning and shopping, and takes public transportation," referring to the observations of Dr. Idupuganti, the state agency consultative examiner. (R. 26.) Based on this evidence, the ALJ determined that Plaintiff had only a "mild limitation" in activities of daily living. (*Id.*) Regarding the second functional area — social functioning —the ALJ concluded that Plaintiff had only a "mild limitation" in this area as well, relying on "more recent" treatment notes from Dr. Fisch which observed Plaintiff as in a "jolly mood" and "full of sarcastic humor,"

and which indicated that Plaintiff claimed to be feeling well. (*Id.*) The ALJ next considered the third functional area — concentration, persistence, or pace — and noted that medical records from Dr. Ohn's treatment indicated that Plaintiff "had no difficulty with thought control or process," and that the consultative examination concluded that Plaintiff had "coherent and relevant speech," "logical and goal oriented thought processes," average intellectual skills, good memory skills, and good insight and judgment. (*Id.*) Finally, the ALJ determined that there was no evidence that Plaintiff had experienced episodes of decompensation, of extended duration, as Plaintiff had only one hospitalization for his mental impairment, which occurred several years earlier. (*Id.*)

In addition to the evidence cited by the ALJ, the Court finds that other evidence in the record supports the ALJ's determination, particularly those records dated after the alleged onset date. In particular, the Court notes that Plaintiff reported to his treating psychiatrist, Dr. Ohn, on July 30, 2008, October 2, 2008, and on March 25, 2009, that he was doing well, (R. 173, 176−77), and in December 2008, Dr. Ohn characterized Plaintiff's mood and affect as euthymic, (R. 175). Moreover, Dr. Ohn consistently quantified Plaintiff's GAF level, with two exceptions, at a 65, indicating that Plaintiff has "difficulty functioning in single area/*mild* symptoms." (R. 69–171, 174–75, 178–80, 184−86, 450–55.) In addition, throughout her treatment, Dr. Ohn repeatedly reported that Plaintiff's thought content and processes, as well as his psychomotor and speech skills were within the normal range, and Plaintiff's mood was frequently described as euthymic.[22] (R. 169–190, 228–270.)

---

[22] Plaintiff curiously relies on Dr. Ohn's characterization of Plaintiff's mood as "euthymic," in support of his motion. (Pl. Mem. 16.) To be clear, "[e]uthymic is defined as 'relating to, or characterized by euthymia' (joyfulness; mental peace and tranquility; moderation

Plaintiff points to evidence which he believes contradicts the ALJ's conclusion. First, most of the evidence relied upon by Plaintiff — specifically, Plaintiff's 2007 hospitalization, treatment notes from Dr. Fisch in which Plaintiff reported feelings of depression, no vigor for life, paranoia, and lack of stamina and where Dr. Fisch noted Plaintiff's illogical thinking, Plaintiff's self-reported panic attack, and the incident where he almost hit his wife with a vacuum cleaner — reflect occurrences before Plaintiff's alleged onset date. "[M]edical evidence that predates the alleged disability onset date is ordinarily not relevant to evaluating a claimant's disability." *Carway v. Colvin*, No. 13-CV-2431, 2014 WL 1998238, at *5 (S.D.N.Y. May 14, 2014) (citing *Briscoe v. Astrue*, 892 F. Supp. 2d 567, 582 (S.D.N.Y. 2012)). Even if relevant, there is substantial evidence, from Dr. Fisch's records and otherwise, indicating that Plaintiff's condition improved following these records. (*E.g.,* R. 272 (Dr. Fisch's treatment notes dated June 10, 2008 reporting Plaintiff in a "jolly mood,"), 233 (Dr. Ohn's treatment notes dated March 25, 2009 reporting Plaintiff as "doing well").) Moreover, the fact that Plaintiff points to competing evidence as proof that his bipolar condition should have been characterized as severe by the ALJ, does not mandate remand so long as substantial evidence supports the ALJ's determination. *See Brunson v. Apfel*, No. 97-CV-4458, 1998 WL 557593, at *5 (S.D.N.Y. Sept. 2, 1998) ("Even if there is ample evidence to support . . . [an] opinion [contradicting the ALJ's decision], this court can only overturn the ALJ decision if that decision is not based on substantial evidence. Therefore, where there is substantial evidence supporting both the plaintiff's position and the ALJ's decision, the ALJ must be affirmed.") As set forth above, there is substantial evidence supporting the ALJ's determination regarding the severity of Plaintiff's

---

of mood, not manic or depressed)." *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 624 n.3 (S.D.N.Y. 2006) (citing *PDR Medical Dictionary*, 627 (2d Ed. 2000)).

mental impairment, including that evidence identified by the ALJ.  Accordingly, the Court finds

no reason to vacate the ALJ's decision as to this issue.

### iii.  The ALJ's RFC determination is not supported by substantial evidence

Plaintiff argues that the ALJ's RFC determination is not supported by substantial

evidence.  Specifically, Plaintiff contends that the record demonstrates that Plaintiff's condition

has worsened since he retired from employment in June 2008.  (Pl. Mem. 20.)  Moreover,

Plaintiff argues, the opinion of Dr. Chakrabarti, the consultative examiner, does not support the

ALJ's RFC determination because Dr. Chakrabarti reported several "abnormal findings" related

to Plaintiff's back and knee condition.  (*Id*. at 20–21.)  Plaintiff further contends that because Dr.

Chakrabarti did not provide any assessment as to Plaintiff's functional limitations, his "silence"

in this regard cannot provide support for the ALJ's RFC determination.  (*Id.* at 21−22.)  Plaintiff

argues that the "sole support" for the ALJ's RFC finding is the RFC assessment completed by J.

Niles, who is not identified as a doctor, and thus whose opinion could not be given evidentiary

weight.  (*Id*. at 22–23.)  Thus, Plaintiff argues, as there is no medical source statements in the

record supporting the ALJ's RFC determination, the Court should remand this case in order to

obtain a medical source opinion from an examining or treating provider to assess Plaintiff's

functional limitations.  (*Id*.)  As set forth below, the Court finds that the ALJ's RFC

determination is not supported by substantial evidence.

The ALJ determined that Plaintiff could perform the "full range of medium work."  (R.

27–28.)  Medium work is defined as involving "lifting no more than 50 pounds at a time with

frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567.  In

making his RFC determination, the ALJ relied on an MRI dated September 15, 2010, of

Plaintiff's lumbar spine which showed "only mild curvature of the thoracolumbar junction, and

moderate degenerative changes;" testing performed on behalf of Staten Island University Hospital on October 9, 2008, showing degenerative changes at the C5–C6 and C6–C7 levels; the report from the consultative examiner, Dr. Chakrabarti, indicating that Plaintiff's cervical, lumbar spine later rotation, flexion, and extension were within normal limits, and both medical evidence and Plaintiff's testimony indicating that his pain medication is effective at controlling his symptoms.  (R. 28.)  However, none of these medical sources assessed Plaintiff's functional capacity or limitations, and therefore provide no support for the ALJ's RFC determination.  In fact, the ALJ's RFC determination is wholly unsupported by any medical evidence as the record is devoid of any opinions from treating or examining medical sources regarding Plaintiff's functional or work capacity limitations, such as Plaintiff's lifting, carrying, sitting or standing limits.  Under these circumstances, the ALJ was obligated to develop the record and obtain RFC assessments from Plaintiff's treating and/or examining physicians.[23]  *See Marshall v. Colvin*, No. 12-CV-6401T, 2013 WL 5878112, at *8 (W.D.N.Y. Oct. 20, 2013) (Where a "treating physician has not assessed a claimant's RFC, the ALJ's duty to develop [the record] requires that he *sua sponte* request the treating physician's assessment of the claimant's functional capacity."); *Aceto v. Comm'r of Soc. Sec.*, No. 08-CV-169, 2012 WL 5876640, at *16 (N.D.N.Y. Nov. 20, 2012) (Because "the ALJ had nothing more than treatment records and consultative reports to review, he had an affirmative duty to develop the record and request that Plaintiff's treating physicians assess her RFC."); *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) ("[T]he duty to

---

[23]  "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."  *Perez v. Chater*, 77 F.3d 41,47 (2d Cir. 1996).  The ALJ's obligation in this regard is a threshold duty, requiring that ALJ to adequately develop the record before deciding the appropriate weight to give the treating physician's opinion."  *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."  (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))).

develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability.").

Instead of developing the record, the ALJ reached his RFC conclusion based, in part, on the absence of this information in the record, stating that his RFC determination "is supported by . . . the lack of medical opinion evidence of any greater functional limitations." (R. 28.) However, the ALJ was not permitted to construe the silence in the record as to Plaintiff's functional capacity as indicating support for his determination as to Plaintiff's limitations. *See Rosa v. Callahan*, 168 F.3d 72, 81 (2d Cir. 1999) (finding that the Commissioner of Social Security was "precluded from relying on the consultant[] [examiner's] omissions as the primary evidence supporting its denial of benefits"); *Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594, at *13 (E.D.N.Y Sept. 11, 2012) ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of a supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." (citing *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347–48 (E.D.N.Y. 2010))); *Collado v. Astrue*, No. 05-CV-3337, 2009 WL 2778664, at * (S.D.N.Y. Aug. 31, 2009) ("[A]n ALJ cannot rely upon the absence of information in the course of rendering his or her decision." (citing *Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 450 (S.D.N.Y. 2004)) (order adopting report and recommendation); *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities."); *see also Carroll v. Sec. of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983) (observing that as three of the plaintiff's doctors were "never asked what work or activity . . . he *could* perform . . . hence [they] expressed no opinion on that subject").

The only evidence in the record as to Plaintiff's functional limitations as it relates to his physical impairment either contradicts the ALJ's RFC determination, or cannot, as a matter of law, be relied upon heavily by the ALJ in making his determination. Plaintiff reported to Dr. Chakrabarti that he can only stand for ten to fifteen minutes before needing to change positions and that he can only sit for ten to fifteen minutes before experiencing spasms. (R. 438.) Dr. Chakrabarti even noted atrophy in Plaintiff's right calf, which he believed merited further follow up. (R. 439–40.) By contrast, J. Niles, a source who is not identified as a doctor and who did not examine Plaintiff, opines that Plaintiff can lift and carry fifty pounds occasionally, lift and/or carry twenty-five pounds frequently, stand and/or walk with normal breaks for six hours in an eight hour day, and sit with normal breaks for six hours in an eight hour day. (R. 432–33.) Because Niles does not appear to be a medical professional, his RFC assessment should have been entitled to "no weight as a medical opinion." *Box*, 3 F. Supp. 3d at 46 (citing *Sears v. Astrue*, 11-CV-138, 2012 WL 1758843, at *6 (D. Vt. May 15, 2012) (collecting cases)). Yet, it appears that the ALJ *did* rely heavily on this opinion as Niles is the *only* source that provides any support for the ALJ's RFC determination. By failing to support the RFC determination with proper medical evidence, the ALJ committed legal error, warranting remand. *Hilsdorf*, 724 F. Supp. 2d at 348 (finding that there was not substantial evidence supporting the ALJ's RFC determination as there was no opinions from the plaintiff's treating physician, and no RFC assessment from "any proper source" and characterizing the opinion of the disability analyst as "not entitled to any weight"); *cf. Whitney v. Astrue*, No. 09-CV-0484, 2010 WL 3023162, *4 (W.D.N.Y. July 29, 2010) ("The ALJ's reliance on the vague opinions of a non-treating consultative physician [in reaching his RFC determination] does not constitute substantial evidence."). Because there is no medical evidence supporting the ALJ's RFC determination, the

Court remands this case pursuant to 42 U.S.C. § 405(g) for further proceedings. On remand, the ALJ is directed to develop the record as it relates to Plaintiff's physical impairment by obtaining RFC assessments from medical sources, including Plaintiff's treating physicians.

### iv. Credibility determination

In assessing Plaintiff's credibility, the ALJ concluded that while Plaintiff's physical impairment could "reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent," with his RFC determination. (R. 28.) As the Court has found the ALJ's RFC determination is not supported by substantial evidence, the ALJ is directed to reevaluate his credibility determination on remand. *See Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 78 n.5 (2d Cir. 2012) (where the ALJ's credibility determination was based on his RFC finding, the court directed the ALJ to reassess his credibility determination in light of the court's finding that the RFC finding was not supported by substantial evidence).

## III. Conclusion

For the foregoing reasons, the Court denies Defendant's motion for judgment on the pleadings. The Commissioner's decision is vacated as to Plaintiff's physical impairment and the Court remands this action for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of the Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 23, 2015
       Brooklyn, New York